1
2
3
4
5
6
7 **IN THE UNITED STATES DISTRICT COURT**
8 **FOR THE EASTERN DISTRICT OF CALIFORNIA**
9
10 JEANINE SPENCE,                           CASE NO. CV F 07-0676 LJO DLB
11                 Plaintiff,          _____ **SUMMARY JUDGMENT DECISION**
        vs.                                (Doc. 24.)
12
   UNITED STATES OF AMERICA,
13
                Defendant.
14 _____/

15                          **INTRODUCTION**

16         Defendant United States of America ("Government") seeks summary judgment on plaintiff

17 Jeanine Spence's ("Ms. Spence's") negligence and premise liability claims arising from her bicycle fall

18 at a military training facility during a cycling event. The Government seeks to bar Ms. Spence's claims

19 pursuant to her written release, California recreational use immunity, and the doctrine of primary

20 assumption of risk. Ms. Spence responds that disputed issues of material fact bar summary judgment

21 and that the Government advances inapplicable legal theories. This Court considered the Government's

22 summary judgment motion on the record[1] and VACATES the April 13, 2009 hearing, pursuant to Local

23 Rule 78-230(h). For the reasons discussed below, this Court GRANTS the Government summary

24 judgment.

25 _____

26         [1]        This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony,
   statements of undisputed facts and responses thereto, objections and other papers filed by the parties. Omission of reference
27 to an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the argument,
   document, objection or paper. This Court thoroughly reviewed, considered and applied the evidence it deemed admissible,
28 material and appropriate for summary judgment.

                                              1

# BACKGROUND

## Summary

On May 14, 2005, Ms. Spence bicycled in the Central Coast Double Century ("CCDC"), a difficult 210-mile recreational bicycling challenge which passes through Fort Hunter Liggett ("FHL"), a Government military training facility in Monterrey County. Her bicycle's front wheel fell into a gap in FHL's Nacimiento Bridge, a steel bridge, and Ms. Spence fell over the handlebars and suffered facial and dental injuries. Pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, Ms. Spence pursues personal injury claims against the Government under theories of negligence, premises liability and negligent inspection.

## The CCDC

The CCDC is a grueling one-day recreational ride with more than 13,800 feet of climbing. It starts in Paso Robles, proceeds north on the Pacific Coast Highway, and loops through FHL before returning to Paso Robles. The CCDC is not a race, but rather, using Ms. Spence's words, is "an endurance challenge for cyclists to cycle a long distance over changing terrain on public roads. The challenge is in completing the course . . . ." In the annual CCDC, 125-160 cyclists participate. Brian Stark ("Mr. Stark"), an experienced cyclist, has organized the CCDC since its 1995 inception and selects the CCDC course, including the portion through FHL. Neither CCDC cyclists nor Mr. Stark paid an admission fee to enter or use FHL roads although Mr. Stark was required to pay a fee for cyclists to use a FHL picnic area.

## The FHL And Nacimiento Bridge Improvements

FHL comprises 165,000 acres in southern Monterey County and is used for Army Reserve training and general public recreation. Public admission to FHL is free.

The Nacimiento-Fergusson Road leads to the Nacimiento Bridge, where Ms. Spence fell. The Nacimiento-Fergusson Road connects California Highway 101 and the Pacific Coast Highway and is used by civilians and military personnel to commute to work and for recreation.

The Nacimiento Bridge is 256 feet long and 18 feet wide with a deck of plates of open, fitted grating. In 1979, the Nacimiento Bridge was improved, including an extension surfaced with three steel grate plates with what the Government describes as "narrow" gaps between the plates. Ms. Spence

2

describes the "new bridge approach" as "four steel grated panels approximately 10 feet long abutting the edge of the existing wood bridge deck on one end and the roadbed on the other." The Government characterizes the Nacimiento Bridge's steel grate surface as a "hazard . . . readily apparent to any cyclist just by seeing the bridge and causes cyclists to be even more vigilant." Ms. Spence notes that the gaps run longitudinally between the plates and range in width from 3/8 inch to 1½ inches.

Todd Goolkasian ("Mr. Goolkasian"), Ms. Spence's expert structural and civil engineer, notes in this declaration that after the bridge approach was rebuilt, plans were drawn to replace the Nacimiento Bridge's wood deck with galvanized steel grating. According to Mr. Goolkasian, panels were to be placed with no gaps between them either parallel to the flow of traffic or perpendicular to it. Mr. Goolkasian notes that the bridge was finished with gaps in its approach but not in its remaining section. Mr. Goolkasian opines that repairs to the bridge approach to correct the gaps should have been taken but were not. Mr. Goolkasian construes gaps wider than ½ inch as non-compliant with "laws, regulations, and industry standards"[2] and "government policies to encourage bicycle transportation and to foster bicycle safety."[3]

### Nacimiento Bridge Inspection

Pursuant to 23 C.F.R. § 650.311, the Nacimiento Bridge is subject to no less than biannual inspection. Mr. Goolkasian notes that such inspection requires a check for defects in a bridge's deck and approach.

The FHWA inspected the Nacimiento Bridge on June 24, 2004. Ms. Spence attributes Mr. Goolkasian to opine that a proper bridge inspection would have revealed gaps in the bridge approach which did not conform with design drawings and did not comply with legal and regulatory requirements,

---

[2]     Ms. Goolkasian identifies such laws, regulations and industry standards as the Americans with Disabilities Act Accessibility Guidelines, § 302.3; Department of Justice ADA Regulations, 28 C.F.R. Part 36, Appendix A, § 4.5.4; California Highway Design Manual § 1003.6(2), (3) and Table 1003.6; and American National Standards Institute(" ANSI") § 302.3.

[3]     Mr. Goolkasian identifies such policies as the Federal Highway Administration ("FHWA"), "Implementing Bicycle Improvements at the Local Level"; Transportation Equity Act for the 21st Century, 105 P.L. 178, § 1202; FHWA, "Design Guidance Accommodating Bicycle and Pedestrian Travel: A Recommended Approach, A U.S. DOT Policy Statement Integrating Bicycling and Walking into Transportation Infrastructure"; and American Association of State Highway and Transportation Officials ("AASHTO") "Guide for Development of Bicycle Facilities."

industry standards, and government policies.[4] FHWA Lead Structural Engineer for the Bridge Inspection Office Marcus Miller ("Mr. Miller") rebuts such points in his declaration and notes the inspection's aim is "to ascertain the condition of the bridge and its safety for highway and military motor vehicle traffic. The gaps in the approach span did not constitute a defect in terms of the motor vehicle traffic this bridge was designed to carry."

### Pre-CCDC Marking Of The Nacimiento Bridge Approach

As he had with prior CCDCs, on the day prior to the 2005 CCDC, Mr. Stark marked the asphalt leading to the Nacimiento Bride gaps with bright fluorescent orange paint. In his declaration, Mr. Stark states that "marking of potential road hazards with paint is a typical method employed by organized cycling events and cyclists to warn of potential hazards." Mr. Stark expected CCDC cyclists to be able to detect the gaps' potential hazard.

In his declaration, Mr. Stark characterized potential hazard from the gaps in the Nacimiento Bridge as " highly improbable" given "the bright fluorescent markings, the narrowness of the gaps in comparison to the rest of the bridge surface, the fact that the gaps were obvious and the typical vigilance of cyclists." Mr. Stark never filed a complaint with FHL about the gaps, which he likens to "other potential road hazards such as breaks in the road surface, an irregular surface, debris, moisture and potholes."

Mr. Goolkasian opines there was "no adequate or appropriate signage to warn cyclists of the hazard." Mr. Miller responds that in Nacimiento Bridge's absence of a designated bicycle lane/pathway, "no signage requirement for such traffic would apply." Ms. Spence notes that she could not see the bridge surface prior to coming on to it. In his declaration, fellow 2005 CCDC cyclist Peter Ozorio ("Mr. Ozorio") states that after Ms. Spence's mishap, he observed paint symbols of "only a few inches long" just before the bridge but had not seen them when he cycled toward the bridge with Ms. Spence. Mr. Ozorio noted the absence of "other warnings about the hazard."

/ / /

---

[4] Mr. Goolkasian's declaration comments are not a sweeping as Ms. Spence claims in that Mr. Goolkasian declared "that an adequate and proper inspection of the bridge in accordance with the *Bridge Inspector's Reference Manual* would have revealed the non-conforming gaps in the bridge approach which should thereafter have been repaired."

4

## The Government's CCDC Knowledge

Since the CCDC's 1995 inception, the Government has known that the CCDC passes through FHL and the Nacimiento Bridge but has not organized, sponsored nor supported the CCDC. The Government has had no involvement with the CCDC, including selection or inspection of the CCDC course or determination or marking potential hazards. Mr. Stark declares that the Government "has never professed any expertise in evaluating the safety of the roads and bridges on FHL for cyclists" and has never guaranteed or represented the "suitability or safety of the roads and bridges on FHL for cycling."

Since 1979 improvements to the Nacimiento Bridge, the Government has been aware that three narrow gaps exist between the bridge's steel grate plates. From 1979 to Ms. Spence's May 14, 2005 mishap, no bicycle incidents arose at the Nacimiento Bridge, and the Government received neither notice of personal or property damages involving a bicycle and the Nacimiento Bridge's narrow gaps nor complaints concerning the Nacimiento Bridge's safety for cycling or its narrow gaps. The Government concludes that from 1979 to Ms. Spence's mishap, it lacked "knowledge that the gaps in the Nacimiento Bridge presented a possible hazard to cyclists."

Ms. Spence notes that Derek Chrisman ("Officer Chrisman"), a FHL police officer, observed Mr. Stark spray painting the road leading to the Nacimiento Bridge the day before the 2005 CCDC. Mr. Stark explained to Officer Chrisman that Mr. Stark was marking off "hazards" on the course.

## Ms. Spence's Cycling Experience

Ms. Spence started cycling in 2001. In the year prior to the 2005 CCDC, Ms. Spence completed several double century bicycling events, four or five century events, and cycle club and training rides.[5] Ms. Spence completed without incident the 2004 CCDC, which covered the same course, including the Nacimiento Bridge, as the 2005 CCDC. The Government characterizes Ms. Spence, at the time of the 2005 CCDC, as "a seasoned cyclist with numerous centuries, double centuries, and training miles on a bicycle to her credit."

Ms. Spence executed and was required to execute a release of liability for each of her recreational

---

[5]   A double century event requires no less than 200 miles. A century event requires no less than 100 miles.

cycling events. According to the Government, Ms. Spence realized that she needed to sign a release to participate in each CCDC.

### Drafting

In his declaration, Mr. Stark explains that drafting "is a technique used by cyclist[s] to conserve energy" whereby cyclists "are lined up single file one behind the next." Ms. Spence describes drafting as "a common practice in distance cycling where airflow of a lead bicyclist will provide some pull for following cyclists." Mr. Stark notes that the "cyclists behind the lead rider in a draft are unable to see the roadway ahead and thus, unable to visualize potential road hazards, such as the gaps in the Nacimiento Bridge." Mr. Stark places responsibility on "the lead rider in a draft to call out road hazards to the cyclists behind him or her." In her deposition, Ms. Spence testified consistently with Mr. Stark's observations regarding drafting:

> And usually when you're riding and you're drafting someone they will – the person in the lead will call out those dangers to the person behind or the pace line behind where – especially people riding Double Centuries are usually pretty good cyclists. They've got a lot of experience, so they're usually pretty good about calling out any kind of danger like that.

Ms. Spence equated calling out dangers to following riders to "just like breathing when you ride a bike. It's common. You don't even think. . . . It's second nature."

### The 2005 CCDC

For the 2005 CCDC, Ms. Spence paid an entry fee to organizer Mr. Stark and completed a registration form which included the following release ("release") in 7 point type and drafted by Mr. Stark:

> I hereby release BMS Cycling, K-Man Cyclery, the California Triple Crown, it's [sic] representatives, directors, our sponsors, the county of San Luis Obispo, the county of Monterey, **the United States Military and all organizations, municipalities, units of government and all properties through which the CCD and CCC will pass** and all their officers and agents and all parties connected with the Century Coast Double, individually and collectively, from all responsibility for death, **injuries, losses, or accidents** before, during or after the CCD or CCC. (Bold added.)

Ms. Spence attended Mr. Stark's pre-CCDC meeting during which he advised of course hazards. Ms. Spence claims that she did not hear the announcements in that crowd noise drowned out the voices

/ / /

/ / /

6

of CCDC organizers.[6]  Ms. Spence started on the CCDC course at 5:40 a.m. on May 14, 2005 in a mass start.  As Ms. Spence approached the FHL entrance, guards waived her through, and she paid no admission fee.

After about 112 miles of cycling over seven hours, Ms. Spence approached Nacimiento Bridge tired and hungry at about 15 miles per hour and drafted off Mr. Ozorio with whom she had been cycling. Mr. Ozorio and Ms. Spence contemplated to stop for lunch at a picnic facility accessible by the Nacimiento-Fergusson Road.  They rode in bright sunlight, but large trees close to both sides of the roadway's bridge approach shaded the roadway and bridge's end.  Ms. Spence attributes difficulty "to discern details of the traveling surface" due to the "contrast from bright to sunny."  Ms. Spence was aware that the bridge was metal in that she had crossed it during the 2004 CCDC.  The Government attributes Ms. Spence to be familiar with the bridge and that she relied on Mr. Ozorio, as the lead rider, to call out potential hazards in that she could not see the road in front of her.  Mr. Ozorio did not call out the bridge's marked gaps as a hazard to Ms. Spence.

The front tire of Ms. Spence's bicycle fell into a gap between the steel grates of the Nacimiento Bridge and dropped to its front wheel axle.  The bicycle stopped immediately.  Ms. Spence fell over the front of the handlebars and landed face first on the bridge's steel surface.  Ms. Spence suffered facial and dental injuries, which she describes as shearing off her nose and most of her lower lip, face and mouth abrasions, and extensive teeth damage.  Ms. Spence has undergone more than 10 reconstructive surgeries and dental procedures to form a new nose and claims that she "will never completely recover."

In her responses to requests for admissions, Ms. Spence admitted that the 2005 CCDC is a recreational event and that the "sole reason" she was on FHL at the time of her mishap was her participation in the CCDC.

### FHL Picnic Facility

The CCDC utilizes a FHL picnic facility.  As of 2002, Mr. Stark and any member of the public was required to pay fee to use the picnic facility to cover cleaning and upkeep costs.  The Government notes that the fee pertained solely to picnic facility use and "had absolutely nothing to do with admission

---

[6]  Ms. Spence notes that cyclists who heard announcements at the pre-CCDC meeting did not hear an announcement regarding the condition of the Nacimiento Bridge's steel plates.

or access to FHL." In 2005, a FHL community activities manager advised Mr. Stark that he would not be able to use the picnic facility due to failure to pay the 2004 deposit to use the picnic facility. The Government notes that the CCDC's use of FHL was not contingent on Mr. Stark paying the 2004 deposit in that FHL admission is distinct from picnic facility rental. Prior to the 2005 CCDC, Mr. Stark paid the past due deposit and a fee for 2005 use of the picnic facility. In his declaration, FHL official Jason Foslien ("Director Foslien")[7] states that the "only consideration received by the United States in connection with the 2005 CCD was solely for the use of the picnic facility."

## Ms. Spence's Claims

Ms. Spence proceeds on her operative Supplemental Complaint for Damages ("complaint") to allege:

1. A (first) negligence cause of action that the Government maintained the Nacimiento Bridge's deck in a perilous condition for bicycle wheels and tires to create a significant risk of injury without warning Ms. Spence;

2. A (second) premises liability cause of action that the Government negligently maintained and operated the Nacimiento Bridge to expose Ms. Spence to an unreasonable risk of injury; and

3. A (third) negligent inspection cause of action that the Government failed to repair and remedy the dangerous condition of the Nacimiento Bridge's deck to assure the bridge was in a reasonably safe condition for Ms. Spence's use.

Ms. Spence seeks to recover past and future medical expenses, earnings, and benefits and for physical and mental impairments, damage to her bicycle and equipment, and emotional distress.

The Government seeks summary judgment that Ms. Spence's claims are barred by her written release, California's recreational use immunity statute, and the doctrine of primary assumption of risk.

## DISCUSSION

## Summary Judgment Standards

F.R.Civ.P. 56(b) permits a party against whom relief is sought to seek "summary judgment on

---

[7] Director Foslien has served in several capacities at FHL and is its current director of emergency services. At the time of the 2005 CCDC, he was FHL's chief of police.

all or part of the claim." Summary judgment is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56(c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *See Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

As discussed below, the Government is entitled to summary judgment in the absence of sufficient factual and legal issues as to its defenses.

### **Release**

#### *Clear, Unambiguous And Explicit*

For the 2005 CCDC, Ms. Spence agreed in writing to release the "United States Military and all organizations, municipalities, units of government and all properties" through which the CCDC will pass "from all responsibility for death, injuries, losses, or accidents." In her deposition, Ms. Spence acknowledged that she signed the release for the 2005 CCDC. The Government argues that Ms. Spence "relinquished" the Government "from any responsibility for injury or loss" sustained during the CCDC in that the release is "clear and unambiguous." Ms. Spence responds that the release "is ineffective to

accomplish its purposes."

California Civil Code section 1541 provides: "An obligation is extinguished by a release therefrom given to the debtor by the creditor, upon a new consideration, or in writing, with or without new consideration." Generally, "a written release extinguishes any obligation covered by the release's terms, provided it has not been obtained by fraud, deception, misrepresentation, duress or undue influence." *Skrbina v. Fleming Companies, Inc.*, 45 Cal.App.4th 1353, 1366, 53 Cal.Rptr.2d 481 (1996).

"To be effective, a release need not achieve perfection . . . . It suffices that a release be clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negligence." *National & Int'l Brotherhood of Street Racers, Inc. v. Superior Court*, 215 Cal.App.3d 934, 938, 264 Cal.Rptr. 44 (1989). The California Court of Appeal in *Brotherhood of Street Racers*, 215 Cal.App.3d at 938, 264 Cal.Rptr. 44, further explained:

> In cases arising from hazardous recreational pursuits, to permit released claims to be brought to trial defeats the purpose for which releases are requested and given, regardless of which party ultimately wins the verdict. Defense costs are devastating. Unless courts are willing to dismiss such actions without trial, many popular and lawful recreational activities are destined for extinction.

In *Bennett v. United States Cycling Federation,* 193 Cal.App.3d 1485, 239 Cal.Rptr. 55 (1987), the trial court granted summary judgment for bicycle race sponsors on the grounds that the plaintiff bicyclist had signed a release before participating in the race. The California Court of Appeal held that the release agreement was valid and enforceable:

> There is little doubt that a subscriber of the bicycle release at issue here must be held to have waived any hazards relating to bicycle racing that are obvious or that might reasonably have been foreseen. As plaintiff points out, these hazards include 'collisions with other riders, negligently maintained equipment, bicycles which were unfit for racing but nevertheless passed by organizers, [and] bad road surfaces. . . .' "

*Bennett,* 193 Cal.App.3d at 1490, 239 Cal.Rptr. 55.

The Government relies on *Okura v. United States Cycling Federation*, 186 Cal.App.3d 1462, 231 Cal.Rptr. 429 (1986), where a plaintiff cyclist sued a race's organizers and sponsors and a municipality for negligent preparation and maintenance of the course after the plaintiff fell when his bicycle hit loose debris as he crossed railroad tracks on the course. The plaintiff cyclist signed an entry form release which read in part:

> . . . I hereby waive, release and discharge any and all claims for damages for death, personal injury or property damage which I may have, or which may hereafter accrue to me as a result of my participation in said event. This release is intended to discharge in advance the promoters, sponsors, [biking federation and its affiliate], the promoting club, the officials, and any involved municipalities or other public entities (and their respective agents and employees), from and against any and all liability arising out of or connected in any way with my participation in said event, even though that liability may arise out of negligence or carelessness on the part of the persons or entities mentioned above.

The California Court of Appeal affirmed summary judgment for the defendant organizers, sponsors and municipality in that "no triable issues of fact exist regarding whether the release form is clear and legible or whether the release form released respondents from the type of risk which caused appellant's injuries." *Okura*, 186 Cal.App.3d at 1468, 231 Cal.Rptr. at 432. The Court of Appeal rejected the plaintiff cyclist's arguments that he was compelled to sign the release and denied a pre-race opportunity to inspect the course and that the release violated public policy. *Okura*, 186 Cal.App.3d at 1465, 231 Cal.Rptr. at 430.

The Government argues that the Nacimiento Bridge's gaps are road hazards to constitute "an inherent risk of cycling" and the "exact type of circumstance contemplated by the release." The Government contends that the 2005 CCDC release "clearly placed the risk of injury" on Ms. Spence, who knew she needed to sign the release to participate in the CCDC.

### The Release's Language And Appearance

Ms. Spence criticizes the 2005 CCDC release's absence of the word "negligence." A "party may not be exculpated or indemnified from liability for its own future negligence without using language that it is both clear and explicit in expressing the intention of the parties in that regard." *Ferrell v. Southern Nevada Off-Road Enthusiasts, Ltd.,* 147 Cal.App.3d 309, 318, 195 Cal.Rptr. 90 (1983). "As long as the release constitutes a clear and unequivocal waiver with specific reference to a defendant's negligence, it will be sufficient." *Madison v. Superior Court,* 203 Cal.App.3d 589, 597, 250 Cal.Rptr. 299 (1988).

To respond to Ms. Spence's criticism of the release language, the Government points to following from *Sanchez v. Bally's Total Fitness Corp.*, 68 Cal.App.4th 62, 66-67, 79 Cal.Rptr.2d 902 (1998):

> " . . .Whether a release bars recovery against a negligent party 'turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control.' (*Rossmoor Sanitation, Inc. v. Pylon, Inc., supra*, 13 Cal.3d at p. 633,

1    119 Cal.Rptr. 449, 532 P.2d 97.)[¶] . . . Our analysis is not based on the mechanical
2    application of some formula. The presence or absence of the words 'negligence' or
     'bodily injury' is not dispositive. We look instead to the intention of the parties as it
3    appears in the release forms before the court."

4        With her 2005 CCDC registration form, Ms. Spence released the Government "from all

5    responsibility for death, injuries, losses, or accidents before, during or after" the CCDC.  Despite Ms.

6    Spence's contentions, the release is broad – "all responsibility."  Ms. Spence points to no governing

7    authority that dictates the presence of "negligence" in the release.  "[E]very possible specific act of

8    negligence of the defendant [need not] be spelled out in the agreement or even discussed by the parties."

9    *Sanchez*, 68 Cal.App.4th at 69, 79 Cal.Rptr.2d 902.  The release contemplates "negligence" with its

10   reference to "responsibility" and "injuries, losses, or accidents."

11       Ms. Spence next criticizes as unreasonable the release's "7 point type and in a font where 7 point

12   is noticeably smaller than other 7 point fonts."  Ms. Spence argues that the release's "legal impact" is

13   "disguised" given that "release" appears "once in a lengthy paragraph without a title" as part of "a

14   convoluted 83 word sentence."  Ms. Spence argues that the release "is so vague that a lay person would

15   not be able to formulate an understanding."

16       Ms. Spence ignores that the 2005 CCDC registration form is simple and short.  After including

17   lines for registration information (name, address, telephone and emergency contact), the registration

18   form includes check boxes for the CCDC and Central Coast Challenge and two sentences of text,

19   including the release language.  Signature and date lines[8] and registration  fee and t-shirt information

20   follow the text.  The release print is consistent in size with the remainder of the registration form, except

21   its heading and direction stating: "PRINT CLEARLY – ONE PERSON PER ENTRY."  More than 30

22   of the words at issue identify released parties.

23       Boiled down to its applicable essence, the release reads:  "I hereby release . . . the United States

24   Military and all . . . units of government and all properties through which the [CCDC] will pass . . . and

25   all parties connected with the Central Coast Double . . . from all responsibility for death, injuries, losses,

26   or accidents before, during or after" the CCDC.  Ms. Spence raises no meaningful point as to the release

27

28   _____

     [8]    Ms. Spence's dated signature appears in close proximity to the release language.

type, font or appearance, especially given her acknowledgment that she signed the registration form with the release. The release is not buried or hidden in fine print. The release is not complicated or riddled with legalese to confuse its common understanding, especially for an educated person like Ms. Spence, who holds a master's degree.

### Appreciation Of Risks

Ms. Spence further criticizes the release for failure to include language regarding assumption of risks in that the form "is in general terms only." Ms. Spence claims that she did not intend to assume a risk that her bicycle tire would fall into a bridge gap to cause her to fall and that the risk she encountered is uncommon to cycling events and thus not reasonably foreseeable.

Curiously, Ms. Spence relies on *Madison*, 203 Cal.App.3d 589, 250 Cal.Rptr. 299, where plaintiffs' son, Ken, drowned during a YMCA scuba diving training course. Ken signed a release by which he "voluntarily releases, discharges, waives and relinquishes any and all action or causes of action for . . . wrongful death occurring to him/herself arising as a result of engaging or receiving instructions in said activity or any activities incidental thereto wherever or however the same may occur and for whatever period said activities or instructions may continue . . ." The California Court of Appeal overturned denial of summary judgment for defendants and addressed the "extent of Ken's knowledge or appreciation of all risks to which he would be exposed":

> Given the express provisions of the agreement, the law imposes no requirement that Ken have had a specific knowledge of the particular risk which resulted in his death. Under the agreement Ken clearly accepted responsibility for the consequences of any act of negligence by the defendants. As the court noted in *Coates v. Newhall Land & Farming, Inc., supra*, 191 Cal.App.3d at page 9, ". . . knowledge of a particular risk is unnecessary when there is an express agreement to assume all risk; by express agreement a 'plaintiff may undertake to assume all of the risks of a particular . . . situation, whether they are known or unknown to him.' . . . Therefore, plaintiffs can claim no triable issue with respect to whether there was a specific discussion of, or disclosure about, the particular risk that resulted in his death (i.e., the defendants' failure to follow the "buddy system" rule). Whether Ken knew about that specific possibility at the time he signed the release is irrelevant.

> Similarly, there can be no issue with respect to whether such negligence on defendants' part was reasonably foreseeable by Ken or reasonably within the potential dangers to which the release is applicable. While it is true that the express terms of any release agreement must be applicable to the particular misconduct of the defendant . . ., that does not mean that every possible specific act of negligence of the defendant must be spelled out in the agreement or even discussed by the parties.

*Madison*, 203 Cal.App.3d at 601, 250 Cal.Rptr. 299 (citations omitted).

14

With the 2005 CCDC registration form, Ms. Spence released the Government and "all properties" through which the CCDC passes "from all responsibility for . . . injuries, losses, or accidents" during the CCDC. Similar to *Madison*, there is no requirement that Ms. Spence have had specific knowledge of the Nacimiento Bridge gaps given her acceptance of responsibility for any injury, loss or accident during the CCDC. Ms. Spence's claims that she lacked knowledge of reasonably unforeseeable bridge gaps are unavailing. The release was not expected to spell out each and every road hazard and risk, especially one as improbable as her tire entering the gap at such a precise nature to cause her mishap. Moreover, Ms. Spence wrongly attempts to ignore the inherent risks of her sport. Ms. Spence appears to have expected a pristine roadway over the course of the 210-mile CCDC. Such expectation is unreasonable given, using her words, the CCDC's "changing terrain."

### Consideration

Ms. Spence faults the release's absence of language "that consideration has been given for the release." Ms. Spence does not dispute that she received the opportunity to participate in the CCDC "in exchange for her execution of the release," but claims that CCDC participation does not run to the Government because the general public "had a right to enter the installation [FHL] on a bicycle without executing any release documents."

Ms. Spence cites no pertinent authority for her consideration notion and merely references *Madison* where the release mentioned consideration to participate in a scuba diving course. *Madison*, 203 Cal.App.3d at 594, 250 Cal.Rptr. 299. Ms. Spence points to nothing in *Madison* where the California Court of Appeal relied on recitation of consideration language to support the release. Ms. Spence's point as to consideration is unpersuasive.

### Public Policy

Ms. Spence argues that the release is unenforceable "as contrary to public policy." Ms. Spence relies on California Civil Code Section 1668: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Ms. Spence attempts to characterize the release as an agreement affecting public interest. The California Supreme Court has explained "characteristics" of such contracts:

It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Tunkl v. Regents of University of Cal.,* 60 Cal.2d 92, 98-101, 32 Cal.Rptr. 33 (1963) (footnotes omitted) (release from liability for future negligence imposed as condition to admission to charitable research hospital was invalid).

Ms. Spence fails to demonstrate how the release is an agreement between the Government and Ms. Spence to affect public interest and to avoid the Government's exculpation. The release is not an adhesion contract between the Government and Ms. Spence. Ms. Spence claims that the Nacimiento Bridge gaps violated "numerous laws and regulations, industry standards, and federal government policies" but fails to explain how the violations arose or what precisely they are.[9] The Nacimiento-Fergusson Road and Nacimiento Bridge were not constructed to serve or promote bicycling interests primarily. The "concept of 'public interest' has no applicability to sports activities." *Buchan v. U.S. Cycling Fed., Inc.*, 227 Cal.App.3d 134, 149, 277 Cal.Rptr. 877 (1991). Ms. Spence fails to substantiate her public interest claim.

### *Mistake*

In an apparent last ditch effort to avoid the release, Ms. Spence claims that she mistakenly signed the release "because she did not know the ramifications of the release language." She claims "a mistake was induced by the silence of the Defendant about the dangerous condition of the bridge." Ms. Spence cites to *Casey v. Proctor*, 59 Cal.2d 97, 103, 28 Cal.Rptr. 307 (1963), where the California Supreme Court explained: "It has often been held that if the releaser was under a misapprehension, not due to his own neglect, as to the nature or scope of the release, and if this misapprehension was induced by the

---

[9] This Court likewise rejects Ms. Spence's "active negligence" points as unsubstantiated and given the scope of the release.

misconduct of the releasee, then the release, regardless of how comprehensively worded, is binding only to the extent actually intended by the releaser."

Ms. Spence offers no evidence to support her mistake theory. There is no evidence that the Government induced Ms. Spence's purported misapprehension as the nature or scope of the release. The Government was not involved in the preparation of the release or obtaining Ms. Spence's signature. Ms. Spence's mistake notion is frivolous.

In sum, Ms. Spence has failed to raise a material factual or legal issue to avoid the release's enforcement. Although the release may not achieve perfection, its clear import is to release the Government "from all responsibility for . . . injuries, losses, or accidents" during the CCDC. Ms. Spence's mishap falls within the release's scope. Based on Ms. Spence's characterization, the CCDC is a hazardous pursuit – a grueling one-day ride with more than 13,800 feet of climbing. As Ms. Spence approached the Nacimiento Bridge, she had cycled for seven hours and was tired and hungry. Fatigue and its effects, including diminished senses, are an inherent risk of long-distance cycling. A less than perfect roadway, including the bridge's gaps, are an inherent risk of the CCDC. The release avoids the Government liability for Ms. Spence's claims, similar to those in *Bennett* and *Okura,* which Ms. Spence fails to address or to attempt to distinguish.

## California Civil Code Section 846 – Liability To Recreational Users

The Government argues that California Civil Code section 846 ("section 846") immunizes it from liability for Ms. Spence's claims.

Under section 846, a landowner "owes no duty of care to keep the premises safe for entry or use by others for any recreational purpose or to give any warning of hazardous conditions, uses of, structures, or activities on such premises to persons entering for such purpose, except as provided in this section." Section 846 defines "recreational purpose" to include "riding, including animal riding, snowmobiling, and all other types of vehicle riding." "The purpose of section 846 is to encourage property owners 'to allow the general public to recreate free of charge on privately owned property.' " *Delta Farms Reclamation Dist. v. Superior Court,* 33 Cal.3d 699, 707-708, 190 Cal.Rptr. 494 (1983), *cert. denied*, 464 U.S. 915, 104 S.Ct. 277 (1983).

Pursuant to section 846, a landowner who gives permission to enter or use premises for a

17

recreational purpose does not:

1.   "[E]xtend any assurance that the premises are safe for such purpose";

2.   "[C]onstitute the person to whom permission has been granted the legal status of an invitee or licensee to whom a duty of care is owed"; or

3.   "[A]ssume responsibility for or incur liability for any injury to person or property caused by any act of such person to whom permission has been granted."

"Section 846 establishes limited liability on the part of a private landowner for injuries sustained by another from recreational use of the land.  The statute provides an exception from the general rule that a private landowner owes a duty of reasonable care to any person coming upon the land."  *Ornelas v. Randolph*, 4 Cal.4th 1095, 1099, 17 Cal.Rptr.2d 594 (1993).

Section 846 applies to the Government in that the Government's tort liability under the FTCA, if any, is to be determined according to the law of California, since that is where the negligent act allegedly occurred.  *Richards v. United States*, 369 U.S. 1, 6-8, 82 S.Ct. 585, 589-590 (1962); *Ravell v. U.S.,* 22 F.3d 960, 961 (1994).  "Thus, in California, § 846 applies to the United States in the same manner it would apply to an individual."  *Casas v. United States*, 19 F.Supp.2d 1104, 1107 (C.D. Cal. 1998).

To support its section 846 immunity defense, the Government points to Ms. Spence's admissions that at the time of her mishap, she engaged in a recreational activity and was on FHL solely to participate in a recreational event.

Despite her admissions, Ms. Spence appears to argue that the CCDC is not a recreational purpose under section 846 given that it is not a race and that its course covers paved roads, not trails.  In an attempt to split hairs, Ms. Spence points to impertinent California Government Code sections regarding dangerous conditions on public property and including California Government Code section 831.7(b)(3) which provides examples of "hazardous recreational activity" and states: "For the purposes of this subdivision, 'mountain bicycling' does not include riding a bicycle on paved pathways, roadways, or sidewalks."

There is no legitimate dispute that Ms. Spence's participation in the CCDC was recreational in that she rode a bicycle.  She admitted her CCDC participation was recreational in her responses to

18

requests for admission. Section 846 "applies to injuries sustained while a plaintiff travels within the property as long as the plaintiff's purpose in entering the property was recreational." *Mattice v. U.S. Dept. of Interior*, 969 F.2d 818, 821 (9th Cir. 1992). Ms. Spence fails to connect California Government Code section 831.7(b)(3)'s mountain bicycling exception to section 846, especially given the exception's express limited application to California Government Code section 831.7(b)(3). Section 846 applies to Ms. Spence's mishap in that bicycling is "riding" and falls under Section 846's "all other types of vehicle riding." Moreover, section 846 "applies to public federal roads on recreational land" and "does not make an exception for paved roads or, more generally, improved property." *Mattice*, 969 F.2d at 821. The limited remaining section 846 issue is whether Ms. Spence is able to invoke an exception to hold the Government liable as a landowner.

### *Section 846 Exceptions*

Section 846 expressly does not limit liability which arises from/to:

1. "[W]illful or malicious failure to guard or warn against a dangerous condition, use, structure or activity";

2. "[I]njury suffered in any case where permission to enter . . . was granted for consideration"; or

3. "[A]ny persons who are expressly invited rather than merely permitted to come upon the premises by the landowner."

In *Ornelas*, 4 Cal.4th at 1099-1100, 17 Cal.Rptr.2d 594, the California Supreme Court summarized section 846's application and exceptions:

> Under section 846, an owner of any estate or other interest in real property owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or to give recreational users warning of hazards on the property, unless: (1) the landowner willfully or maliciously fails to guard or warn against a dangerous condition, use, structure or activity; (2) permission to enter for a recreational purpose is granted for a consideration; or (3) the landowner expressly invites rather than merely permits the user to come upon the premises. The landowner's duty to the nonpaying, uninvited recreational user is, in essence, that owed a trespasser under the common law as it existed prior to *Rowland v. Christian, supra*, 69 Cal.2d 108; i.e., absent willful or malicious misconduct the landowner is immune from liability for ordinary negligence.

The Government argues that it is entitled to section 846 immunity and is not subject to a section 846 exception in that:

19

1.    The Government did not willfully or maliciously fail to warn of the Nacimiento Bridge's gaps which were open, obvious, and clearly marked as a hazard;

2.    Ms. Spence paid no admission fee to enter FHL; and

3.    The Government did not expressly invite Ms. Spence to FHL "for any purpose, much less the 2005 CCDC."

### Willful Or Malicious Conduct

The Government points to the absence of allegations or facts to invoke section 846's willful or malicious conduct exception. The Government argues that it was neither willful nor malicious "in failing to warn or guard against a hidden dangerous condition." The Government points to an absence of evidence of its "actual or constructive knowledge that the gaps presented a hidden peril and that injury was probable as opposed to possible."

Under section 846, the Government is liable as a land owner only for "willful or malicious failure to guard or warn against a dangerous condition, use, structure or activity." Cal. Civ. Code, § 846. The Ninth Circuit Court of Appeals analyzes potential liability under an "intentional tort standard." *Spires v. United States*, 805 F.2d 832, 834 (9th Cir. 198). "The meaning assigned to wilful misconduct by the California courts is any intentional act of an unreasonable character undertaken in disregard of a known risk or a risk so obvious that the actor must be taken to have been aware of it, and so great as to make resulting harm highly probable." *Rost v. United States*, 803 F.2d 448, 451 (9th Cir.1986).

The California Court of Appeals has established essential elements to qualify a land owner's actions as wilful misconduct: "(1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril." *Morgan v. Southern Pacific Transportation Co.*, 37 Cal.App.3d 1006, 1012, 112 Cal.Rptr. 695, 698 (1974).

The Government argues that the Nacimiento Bridge's gaps fall far short "to establish willful misconduct" in that:

1.    The gaps were "open and obvious" and "readily apparent to anyone paying attention";

2.    There were no reported accidents involving the gaps and including those related to "thousands of cyclists [who] passed over the bridge without incident or injury" prior to

the 2005 CCDC;

3.    Mr. Stark, an expert cyclist, clearly marked the gaps with fluorescent paint in "a manner customary to cyclists"

4.    Ms. Spence encountered a 3/4-inch gap in an 18-foot wide bridge deck to render the gap "a relatively minor fraction of the entire bridge surface";

5.    Not all bicycle tires would fit into the bridge's gaps; and

6.    Ms. Spence previously had crossed the bridge without incident and did not report an issue regarding the gaps.

The Government concludes that necessary elements of willful misconduct are missing.

To counter the Government's arguments, Ms. Spence points to Mr. Stark's informing Officer Chrisman, a FHL police officer, the day prior to the 2005 CCDC that Mr. Stark spray painted the Nacimiento-Fergusson Road leading to the Nacimiento Bridge to mark course hazards. Based on Mr. Stark's comments to Officer Chrisman, Ms. Spence argues that the Government "had constructive knowledge that injury was probable."

Under California law, constructive knowledge is measured by an objective standard: "whether a reasonable man under the same or similar circumstances as those faced by the actor would be aware of the dangerous character of his conduct." *Termini v. United States*, 963 F.2d 1264, 1268 (9th Cir. 1992).

The problem for Ms. Spence is that she exaggerates Officer Chrisman's deposition testimony to attempt to create constructive knowledge. As to the spray painting leading to Nacimiento Bridge, Officer Chrisman testified:

> The only thing I could say is that it – I mean, it looks like it was something that they were trying to make something aware of. I wouldn't know what that is, other than it draws my attention to the gap, but not being a bicyclist, I don't know if that's a kind of symbol for them. If I saw something bright and orange in the road, I would look because it's pretty much a cautionary paint.

Ms. Spence fails to demonstrate the Government's actual or constructive knowledge that the Nacimiento Bridge's gaps posed a peril to a CCDC cyclist. *See Coryell v. United States*, 855 F.Supp. 1120, 1122 (C.D. Cal. 1994) (plaintiff's foot slipping into gap between metal ramps at naval air show was neither "an obvious peril" nor a willful or malicious failure to guard or warn against a dangerous

condition to prevent summary judgment for Government).  Ms. Spence relies on matters which fail to establish intentional Government action of an unreasonable character arising from a known or obvious risk.  Ms. Spence points to insufficient facts and legal authority to attempt to impute Officer Chrisman's limited knowledge to the Government.  There are no facts to hint that a tire falling into the gap was probable given the gaps' narrow width and absence of prior cycling incidents at Nacimiento Bridge.  The Government's conscious failure to act is not established by subsequent measures taken after Ms. Spence's mishap.  Ms. Spence creates no factual issue as to Section 846's willful or malicious conduct exception.

### *Consideration*

The Government notes that Ms. Spence paid a fee to participate in the CCDC, not for admission into the FHL, which the Government neither accepted nor required.  The Government argues that to invoke the consideration exception, the "fee must relate to the right to use the land" where the mishap occurred.

To trigger section 846's consideration exception, payment must be made in exchange for "permission to enter " the property or "received from others for the same purpose."  *Miller v. Weitzen,* 133 Cal.App.4th 732, 739, 35 Cal.Rptr.3d 73 (2005).  California cases interpreting the consideration exception have noted that for the exception to apply, consideration must generally be paid "in the form of an entrance fee." *Johnson v. Unocal Corp.,* 21 Cal.App.4th 310, 316-317, 26 Cal.Rptr.2d 148 (1993) ("as regards section 846, we are aware of no cases in which consideration did not involve the actual payment of an entrance fee by plaintiff to defendant"); *Moore v. City of Torrance,* 101 Cal.App.3d 66, 72, 166 Cal.Rptr. 192 (1979) ("Clearly, consideration means some type of entrance fee or charge for permitting a person to use specially constructed facilities," such as "amusement facilities in government-owned parks that charge admission fees"), *disapproved on other grounds, Delta Farms Reclamation Dist. v. Superior Court*, 33 Cal.3d 699, 707, 710, 190 Cal.Rptr. 494 (1983).

The Government argues that Ms. Spence's CCDC entry fee does not translate to consideration to enter FHL.  The Government points to *Casas*, 19 F.Supp.2d 1104, where a runner sued the Government to recover for injuries suffered when she tripped over a raised sidewalk crack on a Marine Corps base during a Government-sponsored race.  A fellow district court held that the consideration

exception did not apply although the plaintiff runner paid a race entry fee, not a base admission fee, and that others paid the race entry fee when they registered on the day of the race. *Casas*, 19 F.Supp.2d at 1108.

      To support that the consideration exception does not apply, the Government points out that:

1.    Ms. Spence was on FHL for the sole purpose to participate in the CCDC, a recreational event;

2.    The Government had no involvement in the CCDC;

3.    Ms. Spence was not required to pay a fee to enter FHL;

4.    Ms. Spence was waved through the FHL gate; and

5.    The consideration which Ms. Spence paid was to participate in the CCDC and was not paid to the Government.

The Government further notes that although "arguably" a portion of her entry fee covered the picnic facility fee, Ms. Spence paid no fee directly to the Government to render use of the picnic facility "separate and distinct from admission to FHL." *See Miller,* 133 Cal.App.4th at 739, 35 Cal.Rptr.3d 73 ("neither [plaintiff] nor anyone else paid consideration for 'permission to enter' that property ( § 846), and the consideration exception to section 846 does not apply"). The Government concludes that the picnic facility usage fee does not negate section 846 immunity in that FHL admission, including use of the Nacimiento-Fergusson Road, "was free to the general public" and CCDC riders.

      Ms. Spence responds, without citation to evidence, that Mr. Stark "paid a fee for permission to stage" the CCDC at FHL. Ms. Spence distorts evidence which reflects that Mr. Stark paid for use of the picnic facility and past due picnic facility fees. Ms. Spence fails to demonstrate that any monies paid in conjunction with the CCDC are related to her or other CCDC riders' entry into or permission to enter FHL. In his declaration, Mr. Stark explains that an FHL official advised that Mr. Stark needed to pay a delinquent 2004 picnic facility fee to permit the facility's use for the 2005 CCDC. Mr. Stark further declared that since the CCDC's inception and including the 2005 CCDC, neither FHL nor the Government has charged Mr. Stark or CCDC participants a fee to enter FHL or to use FHL and its roads. Ms. Spence offers nothing to rebut Mr. Stark's statements.

      Ms. Spence misconstrues the record to unsuccessfully attempt to transform the picnic facility fee

into an admission fee. The fact that the Nacimiento-Fergusson road aided access to the picnic facility in unavailing. There is no evidence that CCDC riders were required to stop at or use the picnic facility. Despite Ms. Spence's claims, she and all other CCDC riders entered FHL without payment of admission or an entrance fee to avoid invocation of the consideration exception.

### *Express Invitation*

The Government contends that section 846's express invitation exception does not apply in that Ms. Spence was not on FHL at the Government's "direct personal request." The Government emphasizes that Ms. Spence was on the FHL to participate in the CCDC, in which the Government had no involvement. The Government points to *Johnson*, 21 Cal.App.4th 310, 26 Cal.Rptr.2d 148, 153, where a plaintiff employee who was injured on land which defendant property owner had made available to his employer for a company picnic did not qualify plaintiff employee as the property owner's "express invitee" to invoke a section 846 exception in that execution of a hold harmless agreement between the property owner and employer was not a direct, personal request from the property owner to the plaintiff employee to attend the picnic.

The Government further argues that Ms. Spence's acquisition of the CCDC registration form from a public source (internet or mail flier) does not invoke section 846's express invitation exception. "Advertisements, brochures, promotional materials or other invitations to the general public are not express invitations to anyone in particular." *Casas*, 19 F.Supp.2d at 1107 (citing *Ravell*, 22 F.3d at 962-963; *Phillips v. United States*, 590 F.2d 297, 299-300 (9th Cir.1979); *Johnson*, 21 Cal.App.4th 310, 26 Cal.Rptr.2d 148 (not an express invitation because not a "direct, personal request" from defendant to plaintiff")).

Ms. Spence offers nothing meaningful to invoke the express invitation exception. Ms. Spence merely claims that the Government knew that Mr. Stark advertised that the CCDC would pass through FHL and "did nothing to retract it" to ratify the "public invitation contained in the event organizer's advertising." Ms. Spence fails to connect CCDC advertising or publicity to a purported Government express invitation to Ms. Spence to come onto FHL.

Lastly, Ms. Spence attempts to avoid section 846 immunity by claiming that the Nacimiento Road is an ordinary public road. Ms. Spence cites to *Seyler v. United States*, 832 F.2d 120, 122 (9th Cir.

1987), where the Ninth Circuit Court of Appeals determined that an Idaho recreational use statute did not shield the Government from liability for a one-vehicle motorcycle accident on Indian reservation roadway, although the injured plaintiff was going for pleasure ride at time of the accident.

Once again, Ms. Spence ignores that she admitted in her responses to requests for admission that the CCDC is a recreational event and that the "sole reason" she was on FHL at the time of her mishap was her CCDC participation. Although Nacimiento Road is paved and used for commuting, at the time of the CCDC, it was engaged for a "recreational purpose," similar to the sidewalk where the plaintiff runner tripped in *Casas* or the paved road involved in *Mattice*. In short, the Government is entitled to section 846 immunity for Ms. Spence's mishap.

## Assumption Of Risk

The Government argues that Ms. Spence's claims are barred by her assumption of risks in the "inherently dangerous" CCDC. The Government contends that Ms. Spence's mishap "was precisely the injury she assumed the risk of encountering while cycling." The Government seeks to invoke the complete bar of recovery under "primary assumption of risk," "where, by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury." *Knight v. Jewett,* 3 Cal.4th 296, 314-315, 11 Cal.Rptr.2d 2 (1992). "Primary assumption of risk arises where a plaintiff voluntarily participates in an activity or sport involving certain inherent risks; primary assumption of risk does bar recovery because no duty of care is owed as to such risks." *Connelly v. Mammoth Mountain Ski Area,* 39 Cal.App.4th 8, 11, 45 Cal.Rptr.2d 855 (1995).

"The existence and scope of a defendant's duty of care in the primary assumption of risk context 'is a legal question which depends on the nature of the sport or activity . . . and on the parties' general relationship to the activity, and is an issue to be decided by the court, rather than the jury.'" *Connelly*, 39 Cal.App.4th at 11-12, 45 Cal.Rptr.2d 855 (quoting *Knight*, 3 Cal.4th at 313, 11 Cal.Rptr.2d 2). Application of the primary assumption of risk doctrine in a sports context is a question of law. *Moser v. Ratinoff*, 105 Cal.App.4th 1211, 1219, 130 Cal.Rptr.2d 198 (2003); *see Lewis v. Mammoth Mountain Ski Area*, 2009 WL 426595, *4 (E.D. Cal. 2009) ("The issue of assumption of the risk is a question of law, which may properly be decided on a motion for summary judgment.")

An activity is a "sport" to which the primary assumption of risk doctrine applies if the activity "is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury." *Moser*, 105 Cal.App.4th at 1221, 130 Cal.Rptr.2d 198. "That delineation is a useful one and covers the bicycle ride here" – the "Death Valley Double Century," a 200-mile noncompetitive bicycle ride on public highways. *Moser*, 105 Cal.App.4th at 1221, 130 Cal.Rptr.2d 198. The "organized, long-distance, group bicycle ride [Death Valley Double Century] qualifies as a 'sport' for purposes of application of the primary assumption of risk doctrine." *Moser*, 105 Cal.App.4th at 1221, 130 Cal.Rptr.2d 198.

As to duty, "defendants generally have no legal duty to eliminate (or protect plaintiff against) risks inherent in the sport itself" but "may not increase the likelihood of injury above that which is inherent." *Moser*, 105 Cal.App.4th at 1222, 130 Cal.Rptr.2d 198 (citing *Knight*, 3 Cal.4th at 315, 11 Cal.Rptr.2d 2). Conduct is not inherent in a sport if it is "totally outside the range of the ordinary activity involved in the sport" and "if the prohibition of that conduct would neither deter vigorous participation in the sport nor otherwise fundamentally alter the nature of the sport." *Moser*, 105 Cal.App.4th at 1222, 130 Cal.Rptr.2d 198 (quoting *Freeman v. Hale*, 30 Cal.App.4th 1388, 1394, 36 Cal.Rptr.2d 418 (1994)).

The Government argues that Ms. Spence assumed the risk of her mishap in that:

1.  Road hazards are inherent to cycling;

2.  Ms. Spence recognized the risk of road hazards and the need to be vigilant when cycling; and

3.  Ms. Spence was familiar with drafting and the need to warn following cyclists of hazards.

The Government contends that the CCDC, like the Death Valley Double Century in *Moser*, is a sport subject to application of the primary assumption of risk doctrine. To apply the doctrine to Ms. Spence's mishap, the Government relies on Mr. Stark's comments in his declaration that "road hazards are an inherent risk associated with cycling," "potential road hazards come in numerous forms, including the road surface," and "road hazards have the potential to cause a rider to fall" and "to cause serious injury and even death."

Initially, Ms. Spence ignores primary assumption of risk in a sporting context and argues that assumption of risk applies only if plaintiff has "general knowledge of a danger" and "knowledge and appreciation of the particular danger and the magnitude of the risk involved." Ms. Spence's argument is suspect given that it relies on *Vierra v. Fifth Avenue Rental Service*, 60 Cal.2d 266, 271, 32 Cal.Rptr. 193 (1963), *abrogated by Knight*, 3 Cal.4th at 314-315, 11 Cal.Rptr.2d 2 (" In cases involving 'primary assumption of risk' – where, by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury – the doctrine continues to operate as a complete bar to the plaintiff's recovery.") Ms. Spence argues that she avoids an assumption of risk defense in that the Nacimiento Bridge's gap failed to conform to "legal, regulatory, or industry standards" and violated Government policies.

The CCDC is akin to the Death Valley Double Century to warrant application of the primary association of risk doctrine to Ms. Spence's mishap. As noted above, although Ms. Spence references several road standards and policies, she fails to explain meaningfully a violation of them.[10] Ms. Spence offers nothing meaningful to distinguish the Nacimiento Bridge gaps from other cycling hazards. Often road hazards are unexpected, and Ms. Spence's offering that she did not expect a gap is unavailing given other expected hazards, including rocks, glass, other riders, potholes, wet or slippery pavement, and other vehicles. In short, Ms. Spence assumed the risk to encounter a hazard, such as the bridge gap, in the course of a grueling day-long, 210-mile cycling event with more than 13,800 feet of climbing.

## CONCLUSION AND ORDER

For the reasons discussed above, this Court:

1.    GRANTS the Government summary judgment;

2.    DIRECTS the clerk to enter judgment in favor of defendant United States of America and against plaintiff Jeanine Spence and to close this action; and

///

---

[10]    Moreover, the Government takes exception to Ms. Spence's characterization of violation of road standards and policies. Mr. Miller, the FHWA Lead Structural Engineer for the Bridge Inspection Office, notes in his declaration the misapplication of road standards and policies relied upon by Ms. Spence and invalidation that the Nacimiento Bridge's "approach span was defective, as the gaps in the approach span panels did not constitute a defect in terms of the motor vehicle traffic this bridge was designed to carry."

3. VACATES the September 16, 2009 pretrial conference and October 26, 2009 trial.

IT IS SO ORDERED.

Dated: __April 8, 2009__          _____/s/ Lawrence J. O'Neill_____
                                        UNITED STATES DISTRICT JUDGE